## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, E. Austin Wozniak, being duly sworn, depose and state that:

### INTRODUCTION

1. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and have been so employed since September 1, 2013. I am currently assigned to the Boston Field Office.

2. I am a graduate of the Federal Law Enforcement Training Center, where I completed ATF Special Agent Basic Training and the Criminal Investigator Training Program. Prior to my employment with ATF, I was a police officer with the Dallas Police Department in Dallas, Texas for three years. I am a graduate of Marquette University where I received a Bachelor of Science in Accounting in 2010.

3. I was assigned to the ATF Seattle, Washington, Field Office for approximately five years, where I worked with agents and other law enforcement agencies to target violent crime. I participated in or directed complex criminal investigations, utilized the National Integrated Ballistic Information Network to identify violent offenders for prosecution, and helped create a task force of officers to investigate a series of highway shootings believed to be linked through ballistics evidence. In June 2019, I transitioned to the Albuquerque Field Office in Albuquerque, New Mexico, where I continued to conduct investigations related to firearms, narcotics, and violent crime. In March of 2021, I joined the ATF Boston Field Division.

4.     I have received training in the recognition, identification, and testing of controlled substances as well as in common methods of trafficking in narcotics.  I have participated in surveillance and interdiction operations at known drug locations and have made numerous arrests for drug related crimes.  I have further received training in firearms trafficking and the diversion of legal firearms for unlawful purposes, participated in the investigation of many crimes of violence, including robberies, assaults, and homicides, and made numerous arrests for firearms and violent offenses.

## PURPOSE OF AFFIDAVIT

5.     I am currently investigating Herbert SMALL, a/k/a "HB," for violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances), Title 21, United States Code, Section 846 (conspiracy to commit narcotics trafficking offenses), Title 21, United States Code, Section 843 (use of communication facility in commission of crime), and Title 18, United States Code, Section 922(g)(1) (possession of a firearm by a felon) (collectively, the "Target Offenses").

6.     I make this affidavit in support of an application for search warrant for the following cellular phone, which belongs to and was seized from SMALL at the time of his arrest on November 7, 2023, and is currently in ATF's custody, located at ATF's Boston Field Office, Boston, Massachusetts:

   a.    Red iPhone assigned telephone number (781) 352-3506, with International Mobile Subscriber Identity ("IMSI") number 310260148284544, subscribed to "Carter Crosby" with a listed address of 926 Norwest Drive, Norwood, Massachusetts, and used by SMALL (hereinafter, the "Target Telephone").

2

7.      The Target Telephone is described in greater detail in Attachment A.  There is probable cause to believe that the Target Telephone contains evidence, fruits, and instrumentalities of violations of the Target Offenses, as described herein and in Attachment B.

8.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, witnesses, public records, and database checks. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

<u>July 5-6, 2023: SMALL arranged a fentanyl deal using the Target Telephone</u>

9.      In or around June 2023, a Confidential Informant ("CI")[1] met SMALL[2] while inquiring with other individuals about purchasing controlled substances in the greater Boston area. SMALL provided the CI with the Target Telephone number and indicated he could get the CI "fetty" and "coke", which, based on my training and experience, I know to mean fentanyl and

---

[1] The CI is cooperating for both financial compensation and consideration in a pending drug distribution offense. The CI has cooperated since his/her arrest in 2020, conducted more than 100 controlled purchases of evidence on behalf of ATF.  The CI has an extensive criminal history including convictions for robbery and drug distribution.  Based on the corroboration in this investigation, including audio and video recorded controlled buys, I believe that information received from the CI is reliable.

[2] SMALL has the following felony convictions: on August 10, 2017, SMALL pled guilty to Conspiracy to Participate in a Racketeering Enterprise (18 U.S.C. § 1962(d)) in the United States District Court for the District of Massachusetts; on October 29, 2015, SMALL pled guilty to Possession with intent to Distribute a Class B Controlled Substance in the Boston Municipal Court, South Boston Division.  SMALL is also presently under indictment in Suffolk Superior Court (Massachusetts) for several felony offenses related to the Unlawful Possession and Carrying of a Firearm.

cocaine, respectively. The CI indicated s/he was interested in purchasing one "finger" of fentanyl. Based on my training and experience, I know "finger" to mean approximately 10 grams of fentanyl.

10. On July 5, 2023, the CI contacted SMALL on the Target Telephone to discuss a meeting location to purchase the fentanyl.[3] SMALL agreed to meet the CI at a hotel parking lot in Boston. ATF met with the CI and established surveillance to coordinate the controlled purchase from SMALL.[4] Agents provided the CI with $300 in ATF funds to make the purchase. Once in the parking lot, SMALL called his source of supply for the fentanyl, who informed him the fentanyl would not be ready until the next day. The transaction was postponed and SMALL returned the funds to ATF.

11. On July 6, 2023, SMALL used the Target Telephone to arrange a transaction with the CI in Dorchester. ATF arranged the controlled purchase and the CI met with SMALL in the early afternoon at the agreed location. SMALL entered the CI's vehicle and exchanged a bag of suspected fentanyl for $225 in ATF funds. SMALL also stated, "I don't fuck with the dope, I'm all coke," and "But I have n****s that be having it. That's why it took me a while to get it." Following the deal, the CI met with agents and provided agents with the suspected fentanyl purchased from SMALL. I weighed the suspected fentanyl and determined it had a weight of

---

[3] All of the CI's phone calls with SMALL on the Target Telephone were recorded.

[4] All ATF controlled purchases in this case follow the same basic pattern. ATF searched the CI and CI's vehicle before and after the buy for unauthorized contraband, provided the CI with funds for the purchase and audio and video recording equipment. The CI was surveilled to and from the deal, and ATF surveilled the transaction. The recordings were subsequently reviewed for other undetected or unreported anomalies to ensure the integrity of the transaction to the extent possible.

approximately 11 grams, including the packaging. On November 21, 2023, the Drug Enforcement Administration ("DEA") laboratory notified ATF the substance was fentanyl with a purity of approximately 1.7% and net weight of approximately 10.0 grams.

<u>July 9-10, 2023: SMALL arranged a fentanyl deal using the Target Telephone</u>

12. On July 9, 2023, the CI contacted SMALL on the Target Telephone; SMALL indicated he would not be available for a transaction the following day but would put the CI in communication with "his man," who could supply the CI with fentanyl. On July 10, 2023, ATF conducted a controlled purchase of fentanyl from SMALL and his co-conspirator. The CI was provided $750 in ATF funds for the purchase. When the CI arrived at the location of the drug deal in Dorchester, the CI called SMALL. SMALL stated his fentanyl supplier could hear the CI. The CI was subsequently met by an unidentified male, who provided the CI with a bag of suspected fentanyl in exchange for the ATF funds. Following the deal, the CI met with agents and provided agents with the suspected fentanyl purchased from the unidentified male. An investigator weighed the suspected fentanyl and determined it had a weight of approximately 54 grams, including the packaging. An investigator field-tested the drugs, which field-tested positive for fentanyl.

<u>August 16-17, 2023: SMALL arranged a cocaine and firearm deal using the Target Telephone</u>

13. On August 16, 2023, the CI communicated with SMALL on the Target Telephone and arranged to purchase one ounce of cocaine and a firearm for $1,900; the deal was arranged for the following day. On August 17, 2023, ATF provided the CI with $1,900 in ATF funds for the purchase. SMALL directed the CI to a meeting location in Dorchester. The CI entered the residence at the meeting location and observed SMALL inside. During the transaction, the CI

observed that SMALL had a second firearm with him. The CI reduced the amount of cocaine purchased from SMALL to also purchase the second firearm from SMALL. In exchange for $1,900, SMALL provided the CI with approximately 25 grams of suspected cocaine, a Iver-Johnson Supershot Sealed 8 .22 caliber revolver, serial number 10398, and a Beretta .40 caliber pistol, serial number TY02920, with a magazine containing eleven .40 caliber rounds of ammunition. On December 20, 2023, the DEA laboratory confirmed the substance was cocaine with a purity of approximately 89% and net weight of approximately 20.3 grams.

<u>September 24-26, 2023: SMALL arranged a cocaine deal using the Target Telephone</u>

14. On September 24 and 26, 2023, the CI communicated with SMALL on the Target Telephone to arrange the purchase of cocaine. On September 26, 2023, ATF conducted a controlled purchase of cocaine from SMALL with the CI. Using the Target Telephone, SMALL told the CI, "I don't have it the way you been getting it." Investigators understood that SMALL did not have powder cocaine, but instead had cocaine base. SMALL assured the CI the drugs were "fire" or good quality and directed the CI to 4 Jerome Street in Dorchester. ATF provided the CI with $800 in ATF funds for the purchase. The CI went to the meeting location and parked in front of a white Jeep. The CI observed SMALL exit the Jeep and approached the CI's vehicle. SMALL provided the CI with a bag of suspected cocaine base in exchange for $800 of ATF funds. SMALL then left the area. Following the deal, the CI met with agents and provided agents with the suspected cocaine base purchased from SMALL. Investigators weighed the suspected cocaine base and determined it had a weight of approximately 29 grams, including the packaging. An investigator field-tested the drugs, which field-tested positive for cocaine base.

<u>October 15, 2023: SMALL arranged a cocaine base deal using the Target Telephone</u>

15.     On October 15, 2023, the CI communicated with SMALL on the Target Telephone to arrange the purchase of cocaine base. SMALL agreed to sell the CI cocaine base the following day. On October 16, 2023, ATF conducted a controlled purchase of cocaine base from SMALL. ATF provided the CI with $2,150 in ATF funds for the purchase. SMALL directed the CI to a meeting location in Dorchester and asked the CI to park on the roadside. SMALL arrived in the area and exited a white Toyota Rav-4 and entered the CI's vehicle. Inside the vehicle, SMALL provided a bag of suspected crack cocaine to the CI. Following the deal, the CI met with agents and provided agents with the suspected cocaine base purchased from SMALL. Investigators weighed the suspected cocaine base and determined it had a weight of approximately 70 grams, including the packaging. On December 19, 2022, the DEA laboratory confirmed the substance was cocaine base with a purity of approximately 83% and net weight of approximately 54.2 grams.

<u>October 18, 2023: SMALL informed the CI that he moved using the Target Telephone</u>

16.     On October 18, 2023, the CI called SMALL on the Target Telephone. During the course of the conversation, SMALL informed the CI, "We moved," when discussing the location of a prior controlled purchase. On October 24, 2023, during a follow up text message conversation, SMALL texted the new address to the CI of, "68 Highcrest Terrace."

<u>November 7, 2023: SMALL is arrested by ATF pursuant to federal arrest warrant</u>

17.     On October 20, 2023, this Court issued a GPS tracking warrant (23-mj-7418-JCB), to determine the Target Telephone's location. The address SMALL provided of 68 Highcrest Terrace, Boston, was consistent with the GPS data provided by T-Mobile pursuant to the warrant. SMALL then began to travel out of Massachusetts for extended periods of time.

18.     On October 24, 2023, this Court issued a criminal complaint and arrest warrant (23-mj-7438-JCB) for SMALL for violations of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm) and Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance).

19.     On November 7, 2023, ATF observed SMALL's phone to be located again in the Roslindale area and established surveillance in the area of 68 Highcrest Terrace.  At approximately 9:20 a.m., your affiant placed a ruse phone call to the Target Telephone—the same phone number used by the CI—ostensibly from the apartment complex maintenance provider.  SMALL and the female leaseholder of the unit confirmed they were present at 68 Highcrest Terrace and available for a maintenance person to come to the location.  ATF then proceeded to the location at approximately 9:30 a.m.  SMALL answered the door with a red iPhone in his right hand.  SMALL was taken into custody and an investigator seized the phone and placed it in "airplane mode," preventing it from sending or receiving further signals.  After being taken into custody, SMALL inquired if ATF had "my" phone and ATF affirmed to SMALL the phone was in custody. The phone is locked and is does not bear readily visible external markings to further identify it.  The phone was taken into ATF custody pending a search warrant.[5]

### Drug and Firearm Traffickers Use of Cellular Devices

20.     Based on the foregoing facts and circumstances in which an ATF CI utilized phone calls and text messages to the Target Telephone and subsequently purchased cocaine, fentanyl,

---

[5] It should be noted that investigators believed that SMALL had at least two phones and used the second phone for a brief two-week window of time.  However, investigators believe that the phone on SMALL at the time of his arrest was the Target Telephone, based on the fact that ATF called the Target Telephone approximately 10 minutes before SMALL's arrest and SMALL answered the door with a phone in his hand.

8

and firearms from SMALL and a co-conspirator, there is probable cause to believe both that SMALL engaged in the Target Offenses, and further, that the Target Telephone was an instrumentality of the commission of those offenses.

21. Based on my training and experience, including participation in other investigations and discussions with other law enforcement officials experienced in narcotics investigations, I am aware that it is generally a common practice for drug and firearm traffickers to store messages, photographs, transaction records, and other media on their cellular telephones. Based on this experience and my training, I believe that:

- Drug and firearm traffickers often secrete records of drug or firearm transactions in secure locations within their cellular telephones over which they maintain dominion and control, for ready access and to conceal these items from law enforcement.

- Drug and firearm traffickers commonly maintain electronic documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances and/or firearms. Such records are maintained where the traffickers have ready access to them, commonly on the traffickers' cellular telephones. They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

- Drug and firearm traffickers commonly have photographs of themselves, their associates, their property, and their products in their possession or in their residences, and frequently maintain these photographs on their cellular telephones.

- Drug and firearm traffickers commonly utilize social media applications including Snapchat, Instagram, and Facebook to facilitate their illegal business.

22. Based on all of the evidence obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe that SMALL and his criminal associates, like many drug and/or firearm traffickers, use their cellular telephones in furtherance of their ongoing

9

trafficking activities, and that this evidence may be preserved and stored upon the device for an extended period of time.

## *SEIZURE OF COMPUTER EQUIPMENT AND DATA*

23.     Agents seek to search the Target Telephone used by SMALL, which he used to facilitate his drug and firearm trafficking activities as well as coordinate those activities with other conspirators. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers, such as the Target Telephone, to create and store records of their actions by communicating about them through e-mail, text messages, and through updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, utility, and other accounts online.

24.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

25.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

26. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

    e. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after

examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

## **CONCLUSION**

27.   Based on the information described above, your affiant has probable cause to believe that that Herbert SMALL has violated one or more of the Target Offenses.

28. Your affiant also has probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B, are contained within the Target Telephone described in Attachment A of the respective warrant. I respectfully request a warrant be issued to search the Target Telephone as described.

Respectfully Submitted,

*E. Austin Wozniak*
E. Austin Wozniak
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on January __5__, 2024

_____
Hon. Jennifer C. Boal
United States Magistrate Judge